J-S37042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TAMMY PEDRAZA | : | |
| | : | |
| Appellant | : | No. 2195 EDA 2023 |

Appeal from the Judgment of Sentence Entered July 7, 2023
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s):  CP-39-CR-0001429-2021

BEFORE:  BOWES, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:          **FILED JANUARY 24, 2025**

Tammy Pedraza ("Pedraza") appeals from the judgment of sentence imposed following her jury convictions of one count each of theft by unlawful taking, access device fraud, and receiving stolen property, and two counts of conspiracy.[1]  For the reasons discussed below, we affirm.

The trial court detailed the underlying facts and procedural history as follows:

On August 28, 2019, Mike Sayegh [("Mr. Sayegh")], an employee at Above and Beyond Senior Living, filed a report of fraud to the Allentown Police Department.  Mr. Sayegh was reviewing financial records from one of the residents, Sharon Kennedy [("the victim")[2]].  He noticed suspicious transactions on [the victim's] Bank of America bank card . . . and linked to her personal bank

---

[1] **See** 18 Pa.C.S.A. §§ 3921(a), 4106(a)(1)(ii), 3925(a), 903.

[2] The victim was in hospice care at the time of trial and died prior to sentencing.

account . . ..  These transactions were from March of 2019 through August of 2019, [and] involved physicians, vendors such as Grub Hub and Uber, gym memberships, and Amazon purchases, among other things.  The transactions began after [the victim] had been admitted to Sacred Heart Hospital on March 15, 2019[,] and continued even after her discharge on March 28, 2019, at which time she had been admitted to Above and Beyond.  Detective Joshua Baker [("Detective Baker")] of the City of Allentown Police Department initially received this information on August 23, 2023[,] and began an investigation.  He quickly determined that there were suspicious transactions on the accounts totaling in excess of $25,000.00.

Detective Baker spoke with [the victim] on September 11, 2019.  She denied ever giving anyone permission to use her bank card.  Detective Baker also spoke with [Pedraza's] son, Niko Pedraza [("Niko")], who indicated he knew why Detective Baker was calling and said he would speak to his family.  [Pedraza] showed up at the Allentown Police Department shortly thereafter looking for a report on the investigation.  Detective Baker spoke with her and advised her that he was investigating use of [the victim's] bank account.  [Pedraza] responded that she had permission to use the account from [the victim].  Detective Baker testified that he countered, stating the transactions were in excess of $25,000, and [Pedraza] replied, "Well, we may have went [sic] a little overboard."

Detective Baker began preparing search warrants for various entities with whom transactions were conducted using [the victim's] bank card.  On September 12, 2019, he spoke with [Pedraza] and advised her that he would love to talk to her[,] and she again indicated that "we went a little overboard" or "it got a little out of control."  [Pedraza] maintained that [the victim] paid her in cash and checks for work she performed for [the victim].

Detective Baker met with [Mr.] Sayegh on September 23, 2019[,] and obtained [the victim's] physical bank card . . ..  Detective Baker followed up with Bank of America and determined there had not been any other bank cards issued to [the victim] connected to her account since 2015.

Detective Baker reviewed bank records showing that the credit card account amassed approximately 470 fraudulent

transactions between March 26, 2019[,] and August 26, 2019[,] in the amount of $25,846.63. Detective Baker spoke with [the victim], who told him she opened the bank account in 2015. She denied authorizing anyone to use her account. Detective Baker contacted businesses where [the victim's] card had been used and determined the transactions were completed online or over the phone.

Trial Court Opinion, 11/9/23, at 2-4 (record citations and footnotes omitted, footnote added).

The police arrested Pedraza in August 2020. Early in the proceedings, the Commonwealth moved to preserve the victim's testimony via video. Following a hearing, the trial court granted the motion. Thus, the Commonwealth videorecorded the victim's preliminary hearing testimony.

A jury trial took place in May 2023; the trial court described the evidence at trial as follows:

Olivia Pedraza [("Olivia")] testified during [Pedraza's] trial. Olivia is [Pedraza's] biological daughter and is also facing charges stemming from the offenses in this case. Olivia testified that in March of 2019, she was struggling financially and asked [Pedraza] for help with groceries and daily needs. [Pedraza] provided Olivia with a card number to use, including its expiration date and security code, and the corresponding zip code. Olivia indicated she believed the card number belonged to her mother.

Olivia began making purchases through her phone for groceries and household items. She manually entered the card number each time for the first few transactions, but subsequently saved it to her Amazon and Walmart accounts on her phone. Olivia testified she spoke with [Pedraza] prior to using the card. In addition to Amazon and Walmart, she also used it for [purchases from] Uber, Old Navy, Journeys, and several restaurants.

After a few months, certain purchases were blocked on the card, meaning that they were flagged as suspicious[,] and the transactions did not initially go through. Olivia testified that [Pedraza] called the customer support phone number for the card and verified the transactions, which led to them being processed. Due to the card being blocked, Olivia became suspicious about it. This led her to have a conversation with [Pedraza] during which [Pedraza] assured her that the card belonged to someone for whom she was working and that she had permission to use the card *for necessities*. Olivia stopped using the card in July of 2019 after obtaining full-time employment. Olivia found out about the investigation in September of 2019. She asked [Pedraza] about it and [Pedraza] told her not to worry and that she had it handled. [Pedraza] allegedly reiterated to Olivia that she had permission to use the card.

Detective Baker testified about the extensive documentation he obtained throughout the course of his investigation, and the supporting documentation was admitted into evidence. The charges [were made by Pedraza, Olivia, and Niko and were for medical appointments, auto insurance, Amazon transactions, restaurant and food deliveries, gym memberships, education, utilities, ride shares, Walmart, and court costs and fines].

The combined total for the [verified] items was $16,645.40. . . . In addition, Olivia testified about certain charges for which a certified record was unavailable[.]

[Pedraza] testified in her own defense at trial. . . . [Pedraza] had a background doing hair and makeup, and she offered her services to [the victim]. [The victim] then hired her to do her nails and hair [and ultimately hired her to work] as an at-home care provider for [the victim.]

[Pedraza] testified she first obtained [the victim's] bank card information when [she] took [the victim's] vehicle . . . for service. . . and [the victim] gave [Pedraza] her bank card information over the phone . . .. After this, [Pedraza] claims [the victim] was aware of the fact [Pedraza] had [the victim's] bank card information due to an instance where [the victim] allegedly gave [Pedraza] permission to use her bank card to go to the grocery store and told [Pedraza] she could buy some groceries for herself with the card. [Pedraza] asserted [the victim] was aware

of [Pedraza's] financial hardships as she struggled to pay for her children and moving fees while also enrolled as a student at Lincoln Technical Institute.

[Pedraza provided home-care services to the victim throughout 2018]. She testified that she periodically called to check on [the victim] and ask if she needed assistance with her hair or attending doctor's appointments. [Pedraza] indicated she offered her services for $20.00 per hour. [Pedraza] testified she worked for [the victim] approximately twice per week in this time period and accompanied [the victim] to the bank while she withdrew cash for [Pedraza]. [The victim] also paid [Pedraza] in checks, as shown in evidence, for her services, and sometimes paid [Pedraza] more than $20.00 an hour if [Pedraza] cut and colored her hair. In addition to cash and checks, [Pedraza] also claimed [the victim] paid her by granting her permission to use the bank card for grocery shopping on occasions when [the victim] was not with her.

[Pedraza] claimed [the victim] often asked whether there was any way she could help [Pedraza] and her children. [Pedraza] testified that her son . . . was struggling with mental health problems and needed a car to get to and from his job. She stated that [the victim] knowingly paid for [Pedraza's son's] car insurance and car parts he needed for a vehicle.

[These services ceased prior to the victim's hospitalization]. In March of 2019, [Pedraza] learned about [the victim's] hospitalization and subsequent discharge to Above and Beyond Senior Living Facility. [Pedraza] went to Above and Beyond to speak with [the victim]. [Pedraza] testified that [the victim] indicated "[s]he would be more than happy for my children and me to get the items that we needed to continue to go on with our lives." [Pedraza] further asserted [the victim] was adamant that her extra money did not go to the nursing home. [Pedraza] maintained [the victim] knew [Pedraza] was using her bank card, and her only requirement was that she make [the victim] aware of any purchases [Pedraza] made for her children. [Pedraza] testified [the victim] never told her to stop using the bank card.

[The victim] was in hospice care at the time of the trial. . . . A redacted version of [the victim's preliminary hearing] testimony was played for the jury. During that hearing, [the victim] testified

that she had a Bank of America account from which she wrote checks. She denied ever making any purchases online from Amazon, Uber, or Grubhub. She previously had a gym membership at LA Fitness[] but left the gym. [The victim] denied knowing [Pedraza], Olivia [], or Niko []. She also denied ever giving any of them permission to use her bank card.

Trial Court Opinion, 11/9/23, at 4-10 (record citations and footnotes omitted, emphasis added).

In June 2023, the jury convicted Pedraza of the above-mentioned charges. Following receipt of a pre-sentence investigation report ("PSI"), in July 2023, the trial court sentenced Pedraza to an aggregate aggravated-range sentence of three to six years of imprisonment. Pedraza filed a post-sentence motion, which the trial court denied. This timely appeal followed.[3]

Pedraza raises three issues for our review:

A. Whether the evidence was sufficient to sustain [Pedraza's] convictions for theft by unlawful taking, receiving stolen property, access [device] fraud, and conspiracy based upon the evidence supporting [Pedraza's] testimony that she acted upon the express permission of the alleged victim in the use of the victim[']s account cards?

B. Was the verdict against the weight of all the evidence in regard[] to the proof of whether or not [Pedraza] was properly convicted of theft by unlawful taking, receiving stolen property, access [device] fraud, and conspiracy based upon the evidence supporting [sic] that she acted upon the express permission of the alleged victim in the use of the victim's account cards?

C. Whether the [trial] court abused its discretion by imposing sentences which were manifestly unreasonable and exceeded the standard range of the sentencing guidelines as the court failed to

---

[3] Pedraza and the trial court complied with Pa.R.A.P. 1925.

fully state its reasons for the imposition of the sentences and their deviation into the aggravated range of the sentencing guidelines or otherwise failed to review all appropriate factors as required by law?

Pedraza's Brief at 10-11 (capitalization and punctuation standardized).

In her first issue, Pedraza challenges the sufficiency of the evidence underlying her convictions for theft by unlawful taking, receiving stolen property, access device fraud, and conspiracy. *See* Pedraza's Brief at 20-22.

Pertinently:

[w]e review claims regarding the sufficiency of the evidence by considering whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[]finder to find every element of the crime beyond a reasonable doubt. Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact— while passing on the credibility of the witnesses . . . is free to believe all, part, or none of the evidence. In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact[]finder.

*Commonwealth v. Miller*, 172 A.3d 632, 640 (Pa. Super. 2017) (internal citations and quotation marks omitted).

"A person is guilty of theft if [s]he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive h[er] thereof." 18 Pa.C.S.A. § 3921(a). To be convicted of theft, a defendant must have had a conscious intention to take unlawfully the property of another. *See Commonwealth v. Wilkes*, 676 A.2d 266, 268 (Pa. Super. 1996).

To convict a defendant for receiving stolen property, the Commonwealth must prove: "(1) the property was stolen; (2) the defendant was in possession

- 7 -

of the property; and (3) the defendant knew or had reason to believe the property was stolen." ***Commonwealth v. Foreman***, 797 A.2d 1005, 1011 (Pa. Super. 2002) (citation omitted). "Receiving" is defined as "acquiring possession, control or title, or lending on the security of the property." 18 Pa.C.S.A. § 3925(b). A person who misappropriates property can be convicted as the receiver of that property. ***See Commonwealth v. Shaffer***, 420 A.2d 722, 726 (Pa. Super. 1980).

A person commits access device fraud if she:

> (1) uses an access device to obtain or in an attempt to obtain property or services with knowledge that:
>
> * * *
>
> (ii) the access device was issued to another person who has not authorized its use[.]

18 Pa.C.S.A. § 4106(a)(1)(ii).

Lastly, a person may be found guilty of conspiracy if

> with the intent of promoting or facilitating its commission she: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

To prove the existence of a criminal conspiracy, the Commonwealth must demonstrate the defendant: "(1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared

criminal intent and, (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Chambers*, 188 A.3d 400, 409-10 (Pa. 2018) (citations omitted). "Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy." *Id*. at 410 (citations omitted). Moreover, the essence of criminal conspiracy is the agreement between co-conspirators. We have explained:

> [M]ere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime. There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator. Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators. Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.

*Commonwealth v. Golphin*, 161 A.3d 1009, 1019 (Pa. Super. 2017) (citations and quotation marks omitted).

Pedraza argues the evidence was insufficient to sustain her convictions because she had the victim's permission to use the card. *See* Pedraza's Brief at 20. She further maintains the victim's testimony was not credible because of her dementia. *See id*. at 22.

To preserve a challenge to the sufficiency of the evidence, "an appellant's [Pa.R.A.P.] 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." *Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013) (citation omitted). "Such specificity is of particular importance in cases where . . . the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009) (citation omitted).

In her Rule 1925(b) statement, Pedraza baldly alleged, "the evidence presented was insufficient as a matter of law to support convictions as there was no competent evidence or credible evidence to support the allegation that [Pedraza] acted without authority or with criminal intent to commit theft or the other offenses." 1925(b) Statement, 9/13/23, at 2. While this statement is sufficient to preserve a challenge to Pedraza's convictions for theft and access device fraud, because Pedraza notes specific elements of the crime, it is not sufficient to preserve a challenge to her convictions for conspiracy and receiving stolen property. Thus, we conclude Pedraza waived any challenge to the sufficiency of the evidence for conspiracy and receiving stolen property.

Moreover, even if we focus solely on the preserved challenges to theft and access device fraud, Pedraza's argument is undeveloped. Her less-than-three-page argument consists mainly of boilerplate law and two paragraphs

- 10 -

in which she argues her testimony was credible and the victim's testimony was not. *See* Pedraza's Brief at 20-22. Pedraza's argument thereby disregards our standard of review, which requires we view the evidence in a light most favorable to the Commonwealth as verdict winner, because Pedraza only discusses the evidence in the light most favorable to her and ignores all other evidence. *See Commonwealth v. Diggs,* 949 A.2d 873, 878 (Pa. 2008) (rejecting the appellant's presentation of the facts in a sufficiency claim in the light most favorable to himself). This Court cannot re-weigh the evidence, nor do we engage in credibility determinations. *See Miller*, 172 A.3d at 640. Moreover, Pedraza fails to cite to any relevant legal authority in support of her proposition that suffering from dementia *per se* renders a witness's testimony unreliable as a matter of law.[4] *See* Pedraza's Brief at 20-22. Accordingly, Pedraza has waived her sufficiency of the evidence claim for this additional reason. *See Commonwealth v. Liston*, 941 A.2d 1279, 1285 (Pa. Super. 2008) (*en banc*); Pa.R.A.P. 2101 (providing substantial defects in an appellate brief may compel dismissal or an issue or an appeal).

Even if reviewable, Pedraza's claim would not merit relief. The trial court explained:

> In this case, the evidence was sufficient to sustain [Pedraza's] conviction for [theft, receiving stolen property, and access device

---

[4] The trial court found the victim competent to testify and Pedraza has not challenged that ruling on appeal. *See* Trial Court Opinion, 11/9/23, at 22; Pedraza's Brief at 20-22.

fraud]. The Commonwealth introduced evidence that a Bank of America bank card . . . was issued to [the victim] in 2015. This corresponded with a Bank of America account. . . . Detective Baker testified that [the victim's] social security benefits and pension checks were deposited into that account.

[Pedraza] was providing aid to [the victim] throughout 2018. In April of 2018, she obtained [the victim's] bank card information and retained that information. ***In March of 2019, after [the victim's] hospitalization and subsequent admission into Above and Beyond Senior Living Facility, [Pedraza, who was no longer employed by the victim] began making unfettered use of the bank card and [Pedraza] permitted her children to do so as well.*** The Commonwealth presented sufficient, uncontroverted evidence that the card belonged to [the victim] and that [Pedraza] and her children used that card. The certified transaction records entered into evidence illustrate transactions totaling in excess of $16,000.00 for the personal benefit of [Pedraza, Olivia, and Niko].

[Pedraza] did not dispute all of the transaction history[] but maintained that she was authorized to make these purchases. The Commonwealth presented sufficient evidence that this was not accurate. [The victim] testified that she did not approve those transactions. Even accepting [Pedraza's] version of the events in which [the victim] authorized limited use of the bank card for [Pedraza] to purchase groceries and necessities, the record plainly reflects that the transactions grossly exceeded the scope of [the victim's] alleged authorization. [Pedraza] and her children charged gym membership payments, numerous fast[-]food orders, educational expenses, Uber rides, and various personal health-related [and legal] matters to the bank card. [Pedraza] even admitted to Detective Baker that things went a little overboard in reference to the charges placed on the card. The evidence was sufficient to demonstrate that [Pedraza] committed theft by unlawful taking, access device fraud, and receiving stolen property in this matter.

Trial Court Opinion, 11/9/23, at 20-21 (record citations omitted, capitalization regularized, emphases added).

The court further explained:

In this case, the evidence was sufficient to support [Pedraza's] convictions for conspiracy to commit access device fraud and conspiracy to receiving stolen property. [Pedraza, Olivia, and Niko] all agreed to use [the victim's] bank card information and, in fact, repeatedly used the bank card. Olivia [] testified she linked it to her Amazon and Walmart apps. This was supported by records showing the card that was used for the transactions and [providing] Olivia['s] email address as the contact information for the transactions. Similar evidence was offered to show that both [Pedraza and Niko] undertook the same steps and made numerous purchases for their personal benefit. The evidence supported that these purchases were not authorized by [the victim]. As a result, the evidence was sufficient to sustain convictions for each of the counts on which [Pedraza] was convicted.

Trial Court Opinion, 11/9/23, at 21 (record citations omitted, capitalization regularized, emphases added).

Our independent review of the relevant law and the certified record confirms the trial court's analysis. Further, Pedraza's argument regarding credibility goes to the weight of the evidence, not the sufficiency of the evidence. *See Commonwealth v. W.H.M., Jr.*, 932 A.2d 155, 160 (Pa. Super. 2007) (finding claim jury should not have believed victim's version of events goes to weight, not sufficiency of evidence). Thus, even if not waived, Pedraza's first claim would not merit relief.

In her second issue, Pedraza challenges the weight of the evidence. *See* Pedraza's Brief at 22-24. Our standard of review is settled:

The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.

- 13 -

As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when the figure of [J]ustice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Boyd*, 73 A.3d 1269, 1274-75 (Pa. Super. 2013) (*en banc*) (citation and internal quotation marks omitted).

Pedraza's argument regarding the weight of the evidence is identical to her argument regarding the sufficiency of the evidence, specifically that the testimony of the victim was not credible but hers was. *See* Pedraza's Brief at 23-24.

The trial court disagreed, explaining:

The [trial c]ourt observed the videotaped testimony of [the victim] from the preliminary hearing. It ruled that she was competent to testify despite clearly suffering from the effects of dementia. She was unsure of the day of the week and forgot certain facts about her life. She denied knowing [Pedraza] despite the fact that it was undisputed [Pedraza] worked for her[.]

Any effects of dementia on [the victim] do not *per se* invalidate her testimony. Her credibility was placed before the jury and defense counsel vigorously argued against the jury

- 14 -

finding her credible during the closing argument. More significantly, [the victim's] testimony was not the only evidence tending to support a conviction. Detective Baker was alerted by [Mr.] Sayegh from Above and Beyond Senior Living about suspicious transactions he observed on [the victim's] bank records. When Detective Baker spoke to [Pedraza] about those transactions, she admitted going a little overboard on her and her children's use of the card. Even accepting [Pedraza's] testimony that she was granted limited use of the card as true, the weight of the evidence still favors a finding of guilt because she admitted she exceeded the scope of any authorization she may have had. The jury was within its right to find Detective Baker's testimony in this regard credible.

[Pedraza's] statement to Detective Baker was supported by the voluminous record in this case. [Pedraza] and her children made liberal use of [the victim's] bank card, funding numerous non[-]essential purchases. The weight of the evidence supports the jury's conclusion that, consistent with [the victim's] testimony and [Pedraza's] statement to Detective Baker, these transactions were not authorized by [the victim]. As a result, the [trial c]ourt properly denied the post-sentence motion for a new trial because the verdict was consistent with the weight of the evidence.

Trial Court Opinion, 11/9/23, at 22-23.

We discern no abuse of discretion by the trial court in reaching its determination that the verdict did not shock its conscience. The Commonwealth presented evidence to show Pedraza committed theft, receiving stolen property, access device fraud, and conspiracy from a hospitalized woman suffering from dementia. That the jury chose to believe the testimony provided by the victim and the corroborating evidence rather than credit Pedraza's self-serving testimony, was entirely within its province. Pedraza essentially requests we re-weigh the evidence and assess the credibility of the witnesses presented at trial. This we cannot do, as it is a

task that is beyond our scope of review. The jury, as finder of fact, had the duty to determine the credibility of the witnesses and evidence presented at trial. **See Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa. Super. 2013) (citation omitted) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Pedraza did not so undermine the Commonwealth's evidence as to render it unbelievable. Ultimately, the jury found the evidence demonstrated Pedraza committed the above-noted crimes and the trial court found the verdict did not shock its conscience. Accordingly, we decline to disturb the trial court's rejection of Pedraza's challenge to the weight of the evidence.

In her third and final issue, Pedraza challenges the discretionary aspects of her sentence. **See** Pedraza's Brief at 24-27. There is no absolute right to challenge the discretionary aspects of a sentence. **See Commonwealth v. Hill**, 66 A.3d 359, 363 (Pa. Super. 2013). Before reaching the merits of a discretionary sentencing claim, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved h[er] issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

**Commonwealth v. Edwards**, 71 A.3d 323, 329–30 (Pa. Super. 2013) (citation omitted).

Pedraza preserved her sentencing issue in a post-sentence motion, filed a timely appeal, and included a Rule 2119(f) statement in her brief. Thus, we will review Pedraza's claim.

Pedraza contends the sentence was excessive, the trial court did not consider mitigating factors, and did not place sufficient reasons in the record for sentencing her in the aggravated range of the sentencing guidelines. ***See*** Pedraza's Brief at 24. These claims raise a substantial question. ***See Commonwealth v. Summers***, 245 A.3d 686, 692 (Pa. Super. 2021) (concluding a claim the appellant's sentence was harsh and excessive and the trial court failed to consider mitigating factors raises a substantial question); ***Commonwealth v. Fullin***, 892 A.2d 843, 850 (Pa. Super. 2006) (finding a substantial question presented where the appellant argued the "trial court failed to state on the record sufficient reasons for imposing an aggravated[-]range sentence").

We consider the merits of Pedraza's claim mindful of the following:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Gonzalez***, 109 A.3d 711, 731 (Pa. Super. 2015) (citation omitted).

- 17 -

It is settled "[w]hen imposing a sentence, a [trial] court must consider the factors set forth in 42 Pa.C.S.A. § 9721(b)." ***Commonwealth v. Feucht***, 955 A.2d 377, 383 (Pa. Super. 2008). Section 9721(b) of the Sentencing Code, in pertinent part, states,

> the [trial] court shall follow the general principle that the sentence imposed should call for total confinement that is consistent with [S]ection 9725 (relating to total confinement) and the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The [trial] court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing and taking effect under [S]ection 2155 (relating to publication of guidelines for sentencing, resentencing and parole, risk assessment instrument and recommitment ranges following revocation).

42 Pa.C.S.A. § 9721(b) (footnote omitted). "The [trial] court is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under Section 9721(b). However, the record as a whole must reflect due consideration by the [trial] court of the statutory considerations." ***Feucht***, 955 A.2d at 383 (citations omitted).

Additionally,

> [i]n imposing sentence, the trial court is required to consider the particular circumstances of the offense and the character of the defendant. The trial court should refer to the defendant's prior criminal record, age, personal characteristics, and potential for rehabilitation. However, where the [trial court] had the benefit of a [PSI] report, it will be presumed that [the trial court] was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. Additionally, the [trial] court must state its reasons for the sentence on the record. 42 Pa.C.S.A. § 9721(b). The sentencing judge can satisfy the requirement that reasons for

- 18 -

imposing sentence be placed on the record by indicating that he or she has been informed by the [PSI] report; thus properly considering and weighing all relevant factors.

***Commonwealth v. Conklin***, 275 A.3d 1087, 1098 (Pa. Super. 2022) (citation omitted), ***appeal denied***, 285 A.3d 883 (Pa. 2022).

However, "[a] sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question[.]" ***Commonwealth v. Crump***, 995 A.2d 1280, 1283 (Pa. Super. 2010) (citation omitted). "[W]hen a trial court imposes a sentence that is within the statutory limits, there is no abuse of discretion unless the sentence is manifestly excessive so as to inflict too severe a punishment." ***Commonwealth v. Mouzon***, 812 A.2d 617, 625 (Pa. 2002) (original quotation marks omitted).

Before imposing the aggravated-range sentence, the court indicated its receipt of the presentence investigation ("PSI") report and declined to consider the Commonwealth's claims that Pedraza had not provided good care to the victim and/or that Pedraza's actions resulted in the victim's hospitalization. ***See*** N.T., 7/7/23, 3, 17. However, the court found itself unable to reconcile Pedraza's "rampant" post-employment use of the victim's credit card to purchase goods and services for herself and her children which totaled over $25,000, which understated Pedraza's statement to police that her use of the victim's credit card got "a little out of hand." ***See id***. at 17-18. The court continued:

while [the court] recognize[s] that [] Pedraza does not have a prior record, [the court] believe[s] the sentence [it is] about to impose reflects the unmitigated predatory taking advantage of what may have been an original level of generosity from [the victim]. But certainly[,] did not envision or encompass anything totaling the thefts that occurred here. And that is, that they are thefts. You are stealing from this woman, [] Pedraza.

*Id*.

Upon review, we conclude the trial court did not abuse its discretion in sentencing Pedraza in the aggravated range of the sentencing guidelines and stated sufficient reasons to justify the sentence. The trial court emphasized its concern for particularly vulnerable victims, *i.e.*, the elderly, noted the predatory nature of Pedraza's actions, lack of remorse, and her attempts to minimize and excuse her conduct. As the trial court identified particular facts and specific reasons for Pedraza's aggravated-range sentence, this issue does not merit relief. *See Commonwealth v. Walls*, 926 A.2d 957, 966-68 (Pa. 2007) (no abuse of discretion where individualized sentence was reasonable); *see also Commonwealth v. Zeigler*, 112 A.3d 656, 662 (Pa. Super. 2015) (sentence not manifestly unreasonable where court considered PSI, details of crime, and explained reasons for sentence). Pedraza's final claim does not merit relief.

Accordingly, for the reasons discussed above, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>1/24/2025</u>